**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

CUNNINGHAM ENERGY, LLC, et al.,

                Plaintiffs,

v.                                  CIVIL ACTION NO.   2:20-cv-00061

VESTA O & G HOLDINGS, LLC, et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants Vesta O&G Holdings, LLC, Vesta VFO, LLC, Rick Cott, and Joshua W. Coleman's (collectively "Defendants" or "Vesta") Motion to Dismiss. (ECF No. 11.)   For the reasons discussed more fully below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion.

## I.     *BACKGROUND*

### A.  *Factual Background*

This action arises out of a contract dispute between Plaintiffs Cunningham Energy, LLC, and Cunningham Lease Acquisitions, LLC (collectively "Plaintiffs" or "Cunningham Energy") and Defendants.   The following factual allegations are taken from Cunningham Energy's Verified Complaint.   (ECF No. 1.)

According to the Verified Complaint, representatives of Cunningham Energy entered into negotiations with representatives of Vesta in 2018 concerning the possibility of Vesta funding

certain oil and gas assets and operations conducted or planned by Cunningham Energy in West Virginia.   (*Id.* at 3, ¶ 14.)   At the time of these negotiations, Cunningham Energy owned several oil and gas interests in Clay, Wood, Gilmer, Kanawha, and Roane counties in West Virginia, as well as several real property interests.   (*Id.* at 3, ¶ 16.)   One such real property interest included a surface interest in a parcel of land located in Big Sandy District, Kanawha County, West Virginia (hereinafter the "School Property").   (*Id.* at 3, ¶ 17.)   Cunningham Energy alleges that it provided Vesta with copies of its operating budget requirements, a list of all its oil and gas operations in West Virginia, a drilling budget for seven new oil wells to be drilled, and an accounting of certain outstanding accounts payable ("Tier One Payables") throughout these negotiations.   (*Id.* at 4, ¶ 19.)

     1. <u>The First LOI</u>

Cunningham Energy contends that these negotiations resulted in the execution of a letter of intent on November 29, 2018, under which Vesta allegedly agreed to perform several obligations (hereinafter the "First LOI").   (*Id.* at 4, ¶ 20.)   First, Cunningham Energy alleges that Vesta agreed to form a new limited liability company (referred to in the First LOI, and hereinafter, as "Holdings"), controlled and funded by Vesta, that would offer certain "equity interests" to Cunningham Energy in exchange for the transfer of specific oil and gas assets[1] owned by Cunningham Energy to Holdings ("Holdings Assets").   (*Id.* at 4, ¶ 20, 22.)   Second, Cunningham Energy asserts that Vesta committed to fund all operational expenses and overhead costs associated with the operation of Holdings.   (*Id.* at 4, ¶ 23.)   Third, Cunningham Energy contends that Vesta agreed to extinguish and eliminate certain debt referred to as the "Tier One Payables,"[2] totaling

---

[1]  A comprehensive list of these assets is attached to the First LOI as "Exhibit A."   (*See* ECF No. 18-2 at 5–16.)

[2]  A comprehensive list of these debts is attached to the First LOI as "Exhibit B."   (*Id.* at 17.)

$1,980,804.53.   (*Id.*)   Finally, Cunningham Energy alleges that Vesta agreed to contribute capital to fund the drilling and completion costs of seven wells in West Virginia.   (*Id.*)

The First LOI states "*[e]xcept as specifically provided herein*, this Letter is not intended to be [ ] binding but is instead intended only to serve as basis for negotiation of mutually acceptable agreements to be entered into. . . ."   (ECF No. 18-2 at 1) (emphasis added).   The First LOI also contains a "General Transaction Description," which generally describes the terms of the purported agreement between Cunningham Energy and Vesta.   (*Id.* at 2.)   The terms of the First LOI appear to confirm the commitments Cunningham Energy alleges Vesta agreed to.   Under the First LOI, Vesta would "receive certain equity interests in Holdings," labeled as "Investor's Equity Interest,"[3] in exchange for a commitment "to fund certain operational expenses and overhead costs associated with the operations of Holdings[.]"   (*Id.*)   This operational funding, labeled as "Investment Amount," consists of the following items: (1) "capital . . . to extinguish and eliminate certain debt of Cunningham Energy commonly known as the Tier One Payables[;]" (2) "capital . . . to fund the drilling and completion costs of seven wells in West Virginia[;]" and (3) "capital . . . to engage

---

[3] The First LOI describes Vesta's Equity Interest in Holdings as follows:

- The Investor's Equity Interest shall be:

  o  After repayment of the Investor's Cost Overrun Loan, eighty percent (80%) of the total Equity Interest in Holdings until total cumulative Distributions from Holdings to [Vesta] equals the Investment Amount plus a preferred return calculated like interest and accrued on the balance standing from time to time in [Vesta's] unrecovered Investment Amount at a simple interest rate equal to twelve percent (12%) per annum, non-compounded, and determined on a cumulative basis ("Investor's Preferred Return");

  o  Once Holdings has distributed to [Vesta] an amount equal to the Investor's Preferred Return, [Vesta's] Equity Interest shall be fifty percent (50%) of the total Equity Interest in Holdings.

(ECF No. 18-2 at 2.)

and pay Cunningham Energy for the drilling of the wells owned by Holdings for a period of one year starting at the Closing Date[.]"   (*Id.*)

The First LOI also provided that "[i]n consideration for contribution, transfer and assignment of the [Holdings] Assets . . . , Cunningham Energy will receive certain equity interests in Holdings[.]"   (*Id.* at 2–3.)   Cunningham Energy's "equity interests," which are labeled as "Cunningham Equity Interests" under the First LOI, (*see id.* at 3), are defined as 20% of the total "Equity Interest" in Holdings, after repayment of Vesta's Cost Overrun Loan, until Holdings distributes to Vesta an amount equal to its "Preferred Return."   (*Id.* at 3.)   Once Holdings distributes to Vesta an amount equal to its "Preferred Return," Cunningham Energy's equity interest in Holdings would increase to 50% of the total "Equity Interest" in Holdings.   (*Id.*)

### 2.   Vesta's Subsequent Performance of the First LOI and the First Lawsuit

Cunningham Energy alleges that on December 4, 2018, Vesta began funding this new venture under the terms of the First LOI, and it assigned and transferred its assets to the control of Vesta.   (ECF No. 1 at 5, ¶ 26.)   Vesta allegedly funded Cunningham Energy's drilling operations, partially extinguished its Tier One Payables, and performed in accordance with the terms set forth in the First LOI from December 2018 through February 2019.   (*Id.* at 5–6, ¶¶ 29–31.)

However, on March 1, 2019, the agreement began to fall apart, and Vesta allegedly ceased funding Cunningham Energy's operations and debt obligations.   (*Id.* at 6, ¶ 33.)   Cunningham Energy contends Vesta failed to extinguish $385,841.22 in its Tier One Payables, failed to fund its operating expenses for March and April 2019, and failed to fund the payments incurred in drilling the first of the seven wells.   (*Id.* at 6, ¶ 34–36.)   Cunningham Energy alleges it demanded that Vesta fulfill its investment and funding obligations, but, in response, Vesta ceased all

4

communications.   (*Id.* at 7, ¶¶ 39–40.)   As a result, in May of 2019, Cunningham Energy sued

Vesta for breach of contract and other related claims (hereinafter the "First Lawsuit").   (*Id.* at 7,

¶ 44.)

        3.   The Second LOI and the MOU

      Cunningham Energy claims that the First Lawsuit was settled through the execution of a

second letter of intent (hereinafter the "Second LOI") and a "memorandum of understanding"

(hereinafter the "MOU"), which were understood by Cunningham Energy to govern the further

negotiation and closure of the transaction proposed in the First LOI.   (*Id.* at 8, ¶ 45.)   The MOU

provides for the settlement of the First Lawsuit as follows:

> [s]hould the [ ] proposed terms be agreeable and if Vesta and Cunningham Energy
> agree upon a Letter of Intent currently being negotiated regarding the closing of the
> Proposed Transactions, Cunningham Energy, following the execution of this
> [MOU], will promptly dismiss, *without prejudice*, its claims against Vesta in the
> [first lawsuit][.]   In turn, Vesta will dismiss, *without prejudice*, the counterclaim it
> has asserted against Cunningham Energy entities in the [first lawsuit].

(ECF No. 18-8) (emphasis in original).

      Cunningham Energy contends that, under the Second LOI, the parties agreed to close the

proposed transaction contemplated in the First LOI no later than November 15, 2019, and if they

failed to timely close the transaction, all real property and leases constituting "Holding Assets"

were to be immediately assigned back to Cunningham Energy.   (*Id.* at 8, ¶¶ 46–47.)

      The "Holdings Assets" clause in the Second LOI provides that "[i]n the event the parties

do not consummate the Proposed Transaction by the Closing Date, the Holdings Assets shall be

immediately assigned back to Cunningham Energy. . . ."   (ECF No. 18-7 at 1.)   The Second LOI

defines the "Closing Date" as November 15, 2019.   (*Id.* at 3.)   The "Proposed Transaction,"

though, contains items that were not originally contemplated by the First LOI.[4]   (*Id.* at 2.)

Cunningham Energy claims that it "repeatedly demanded that [Vesta] negotiate in good faith to close the transaction proposed in the [First LOI]."   (ECF No. 1 at 8, ¶ 48.)   Cunningham Energy alleges that Vesta breached the Second LOI and MOU by failing to exercise good faith in the negotiation and attempted closure of the Proposed Transaction.   (*Id.* at ¶ 49.)   By letter dated December 19, 2019, and e-mail dated January 9, 2020, counsel for Cunningham Energy demanded that Vesta assign the Holdings Assets back to Cunningham Energy pursuant to the Second LOI due to the parties' failure to close the Proposed Transaction.   (*Id.* at ¶ 50–51.)   Vesta has allegedly refused to assign the Holdings Assets back to Cunningham Energy and is still in possession of these assets.   (*Id.* at 9, ¶ 53.)

Because Vesta has purportedly refused to assign the Holdings Assets back to Cunningham Energy, Plaintiffs filed their Verified Complaint on January 24, 2020, alleging fourteen causes of action: including breach of contract claims for both the First LOI and the Second LOI and MOU. (*Id.* at 9–19.)   On February 18, 2020, Defendants filed their Motion to Dismiss.   (ECF No. 11.) Plaintiffs timely responded, (ECF No. 18), but Defendants did not file a reply.   As such, Defendants' Motion has been fully briefed and is now ripe for adjudication.

## II.    *LEGAL STANDARDS*

### A.  *Rule 12(b)(6) Motion to Dismiss*

A motion to dismiss for failure to state a claim upon which relief may be granted tests the

---

[4] For example, the Proposed Transaction in the Second LOI contemplates the distribution of proceeds from the condemnation or sale of the School Property by the Kanawha County Board of Education.   Under the Second LOI, the distribution of the first $5 million of those proceeds were to be distributed to Vesta, with the next $25 million retained by Holdings to fund the drilling and completion costs of seven wells in West Virginia by Holdings in accordance with an agreed-upon Budget.   (ECF No. 18-7 at 2.)

legal sufficiency of a civil complaint.   Fed. R. Civ. P. 12(b)(6).   A plaintiff must allege sufficient facts, which, if proven, would entitle him to relief under a cognizable legal claim.   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007).   A case should be dismissed if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.   In applying this standard, a court must utilize a two-pronged approach.   First, it must separate the legal conclusions in the complaint from the factual allegations.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   Second, assuming the truth of only the factual allegations, the court must determine whether the plaintiff's complaint permits a reasonable inference that "the defendant is liable for the misconduct alleged."   *Id.*   Well-pleaded factual allegations are required; labels, conclusions, and a "formulaic recitation of the elements of a cause of action will not do."   *Twombly*, 550 U.S. at 555; *see also King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." (quoting *Iqbal*, 556 U.S. at 679)).   A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [the] claims across the line from conceivable to plausible."   *Twombly*, 550 U.S. at 555, 570.

   B.   *Conversion of Motion to Dismiss to Motion for Summary Judgment*

   Plaintiffs have attached eleven exhibits to their response in opposition.   "Rule 12(b)(6) does not mandate that a district court treat a motion to dismiss as a motion for summary judgment simply because the moving party includes exhibits with its motion."   *Pueschel v. United States*, 369 F.3d 345, 354 n.3 (4th Cir. 2004).   It "only requires that a motion to dismiss be treated as a motion for summary judgment when the motion to dismiss or exhibits present matters outside the

nonmoving party's pleadings and the district court does not exclude such matters." *Id.* Nevertheless, a court may consider extrinsic evidence at the 12(b)(6) stage if such evidence "was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). "The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated where plaintiff has actual notice . . . ." *Trigon Healthcare*, 367 F.3d at 234 (4th Cir. 2004) (internal quotations omitted).

Here, the usual concerns are not present because Plaintiffs, not Defendants, introduced this extrinsic evidence. However, the Court considers only the First LOI, (ECF No. 18-2), the Second LOI, (ECF No. 18-7), and the MOU, (ECF No. 18-8), because Plaintiffs explicitly referenced these documents in their Complaint. (*See* ECF No. 32 at 5, ¶¶ 19–23.) Further, no party disputes the authenticity of these documents. Accordingly, given that all of Plaintiffs' claims involve the First LOI, the Second LOI, or the MOU, this Court may consider them without converting Defendants' Motion to Dismiss to a motion for summary judgment.

## III.    DISCUSSION

Cunningham Energy's Verified Complaint alleges the following fourteen causes of action: (1) Breach of Contract—Initial LOI; (2) Promissory Estoppel; (3) Detrimental Reliance; (4) Breach of Implied Duty of Good Faith and Fair Dealing; (5) Fraud in the Inducement; (6) Misrepresentation; (7) Violation of the West Virginia Uniform Securities Act; (8) Violation of the Securities and Exchange Act; (9) Joint Venture Liability; (10) Piercing the Corporate Veil; (11) Preliminary Injunction; (12) Breach of Contract—Second LOI and MOU; (13) Fraud in the

Inducement—Second LOI and MOU; and, alternatively, (14) TRO/Preliminary/Permanent Injunction. (ECF No. 1.) Defendants challenge all fourteen counts. The Court will address each count in turn.

### A. Count I for Breach of Contract for the First LOI

Vesta argues that Count I for Breach of Contract for the First LOI should be dismissed because "the First LOI was not a contract capable of being breached." (ECF No. 12 at 7.) In this respect, Vesta contends that "[b]y its own terms, the First LOI was 'non-binding,'" and that the language of the First LOI clearly indicates that it was not a contract. (*Id.*) Vesta also argues that "allowing the First LOI to support a damages award against [Vesta] would upend preliminary business dealings." (*Id.* at 7–8.) In support of this argument, Vesta cites a Ninth Circuit opinion discussing various purposes of non-binding, preliminary letters of intent and their role in preliminary negotiations. (*Id.* at 7) (citing *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 317 (9th Cir. 1996)).

Conversely, Cunningham Energy argues that Count I sufficiently states a claim for breach of the First LOI because "the words, acts, and conduct of Vesta show its intent to contract with Cunningham [Energy] pursuant to . . . the First LOI." (ECF No. 18 at 11.) In response to Vesta's argument regarding the non-binding nature of preliminary letters of intent, Cunningham Energy contends that "letters of intent can, depending on the factual circumstances, constitute a binding contract" under Fourth Circuit precedent. (*Id.* at 10–11) (citing *Burbach Broad. Co. of Delaware v. Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002)).

To prove the existence of a valid and enforceable contract under West Virginia law, three elements must be shown: (1) an offer; (2) an acceptance; and (3) that the offer and acceptance is

supported by consideration.   *McCormick v. Hamilton Bus. Sys., Inc.*, 332 S.E.2d 234, 236 n.1 (W. Va. 1985).   The offer and acceptance, often referred to as "mutual assent," requires "a proposal or offer on the part of one party and an acceptance on the part of the other."   *Ways v. Imation Enters. Corp.*, 589 S.E.2d 36, 44 (W. Va. 2003) (quoting *Bailey v. Sewell Coal Co.*, 437 S.E.2d 448, 450–51 (W. Va. 1993)).   "Both the offer and acceptance may be by word, act or conduct that evince the intention of the parties to contract."   *Bailey*, 437 W.E.2d at 450–51.

As the Fourth Circuit has previously noted, "[l]etters of intent have led to much misunderstanding, litigation, and commercial chaos."   *Burbach Broad. Co. of Del.*, 278 F.3d at 406 (citing 1 Corbin on Contracts § 1.16 (1993)).   Courts, including the Fourth Circuit, have expressed reservation concerning the binding nature of "letters of intent" because traditionally, the purpose and function of a preliminary letter of intent has been to merely provide the initial framework from which the parties might later negotiate a final binding agreement.   *Id.* (citing *A/S Apothekernes Lab. v. I.M.C. Chem. Grp., Inc.*, 873 F.2d 155, 158 (7th Cir. 1989)).

However, the Fourth Circuit recognizes two kinds of preliminary agreements that are binding and enforceable: (1) Type I preliminary agreements; and (2) Type II preliminary agreements.   *Id.* at 407 (citing *Teachers Ins. and Annuity Assoc. of Am. v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987)); *see also Branch Banking & Trust Co. v. Meridian Holding Co., LLC*, Civ. Action No.: 3:18-0486, 2020 WL 1908490, at *5 (S.D. W. Va. Apr. 17, 2020) (applying the reasoning set forth by the Fourth Circuit in *Burbach Broad. Co. of Del.*).   Type I preliminary agreements, which are "fully binding preliminary agreement[s]," occur when the parties have reached a complete agreement (including the agreement to be bound) on all issues perceived to require negotiation.   *Id.*   Such an agreement is preliminary in form only in the sense that the

10

parties desire a more elaborate formalization of the agreement. *Id.* Factors that are useful in determining whether a Type I agreement has been made are (1) whether there has been an express reservation of the right not to be bound in the absence of a writing, (2) whether there has been partial performance of the contract, (3) whether all of the terms of the alleged contract have been agreed upon, and (4) whether the agreement at issue is the type of contract that is usually committed to writing. *Id.* at 407–08.

Type II preliminary agreements, which are "binding preliminary commitments," do not commit the parties to their ultimate contractual objective, but they commit the parties to negotiate the open issues in good faith in an attempt to reach the contractual objective within the agreed framework. *Id.* Under this duty to negotiate in good faith, a party is barred from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement. *Id.* Factors to be considered in determining whether a Type II preliminary agreement was formed are (1) the language of the agreement, (2) the existence of open terms, (3) whether there has been partial performance, (4) the context of negotiations, and (5) the custom of such transactions. *Akers v. Minnesota Life Ins. Co.*, 35 F. Supp. 3d 772, 786 (S.D. W. Va. 2014) (citing *Teachers*, 670 F. Supp. at 499–503).

Based upon the well-pleaded factual allegations contained in the Verified Complaint, Cunningham Energy has alleged with adequate plausibility the existence of a binding contract in the First LOI. Although the First LOI states that it "is not intended to be [ ] binding but is instead intended only to serve as a basis for negotiation of mutually acceptable agreements," that phrase is explicitly conditioned by the immediately preceding phrase—"*[e]xcept as specifically provided herein*." (ECF No. 18-2 at 1) (emphasis added). The First LOI also demanded that Cunningham

11

Energy "indicate [its] acceptance by execut[ing] the [First LOI]" if it found "the above terms and conditions [to be] acceptable." (ECF No. 9-7 at 4.) This language, at the very least, implies that the parties mutually assented to the proposed contractual terms contained therein.

Moreover, Cunningham Energy alleges that Vesta partially performed the First LOI by partially extinguishing Cunningham Energy's Tier One Payable debts in the amount of $1,276,360.63, (ECF No. 1 at 5–6, ¶ 29); partially funding Cunningham Energy's operating expenses from December 2018 through February 2019, (*Id.* at 6, ¶ 30); and partially funding the drilling of the first of seven wells contemplated by the First LOI to be drilled in West Virginia, (*Id.* at 6, ¶ 31). Cunningham Energy also alleges that it partially performed its duties under the First LOI by assigning the Holdings Assets to Vesta on December 4, 2018. (*Id.* at 5, ¶ 26.) Lastly, contracts of this sort—which contemplate the transfer of oil and gas assets worth significant capital, including various real estate assets, as well as the formation of an LLC and the relative ownership interests thereof—are undoubtedly the sort that are usually committed to writing.

Vesta's reliance on the Ninth Circuit's decision in *Rennick* is misplaced. First, and most obviously, the *Rennick* decision is non-binding in this District, and this Court is under no obligation to follow its guidance. Second, the *Rennick* decision explicitly recognizes that letters of intent can—*depending on the content of the document and the context of the situation*—be enforceable contracts, so long as the other requisites of a contract have been satisfied. *Rennick*, 77 F.3d at 315. Finally, the factual circumstances surrounding the letter of intent in *Rennick* are distinguishable from those alleged in the Verified Complaint. In *Rennick*, it was glaringly obvious that the parties intended to execute a subsequent, binding agreement and that the letter of intent was not intended to be binding on the signatories. *Id.* at 316 ("[The letter of intent] said

that . . . the parties were negotiating toward an interim agreement not yet made, and that such an agreement would be a subsequent written document subject to approval by the parties' boards of directors[.]").   Conversely, here, the First LOI contains no such language, and the parties' partial performance is indicative of their intent to be bound by the terms of the First LOI.   (ECF No. 1 at 5–6, ¶¶ 26–31.)

At this stage of the proceedings, Cunningham Energy has plausibly alleged the existence of a binding and enforceable agreement.   The execution of the first LOI, when taken with Vesta's alleged subsequent partial performance of the terms of the First LOI, plausibly show the intention of the parties to be bound by the First LOI's terms.   Therefore, because the well-pleaded factual allegations on the face of Plaintiffs' Verified Complaint give rise to a plausible claim for breach of contract of the First LOI, the Court **DENIES** Vesta's Motion to Dismiss with respect to Count I of Cunningham Energy's Verified Complaint.

### B.   Count II for Promissory Estoppel

Vesta argues that Cunningham Energy's Count II for Promissory Estoppel should be dismissed because "Cunningham Energy cannot prove that its reliance on the LOI was justifiable." (ECF No. 12 at 8.)   Cunningham Energy contends that its Promissory Estoppel claim has been sufficiently plead because it assigned its oil and gas interests to Vesta, in reliance "on the [First] LOI, Vesta's promise, and Vesta's subsequent performance."   (ECF No. 18 at 14.)

"A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable . . . if injustice can be avoided only by enforcement of the promise."   Syl. Pt. 3, *Everett v. Brown*, 321 S.E.2d 685 (W. Va. 1984).   Courts must consider several factors to determine

13

whether injustice can be avoided only be enforcement of the purported promise, and the following circumstances are significant:

> (a) the availability and adequacy of other remedies, particularly cancellation and restitution; (b) the definite and substantial character of the action or forbearance in relation to the remedy sought; (c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence; (d) the reasonableness of the action or forbearance; (e) the extent to which the action or forbearance was foreseeable by the promisor.

*Id.*

For many of the same reasons Cunningham Energy's Count I Breach of the First LOI claim survives, its Count II Promissory Estoppel claim also survives.   Cunningham Energy has alleged that Vesta's CFO, Rick Cott, promised funding of operational expenses, drilling expenses, and payment of Tier One Payable debts.  (ECF No. 18 at 14.)   Cunningham Energy contends this promise induced it to assign several of its assets consisting of real property, mineral interests, and oil and gas operations to Vesta's control, and that Vesta clearly expected its promises to induce such action.  (*Id.*)   Cunningham Energy also alleges that injustice can be avoided only by enforcing Vesta's promise to contribute capital under the terms of the First LOI, otherwise it will face creditors, payroll obligations, and other operating expenses without the reasonably expected investment contributions promised by Vesta.  (*Id.* at 15.)

Vesta argues that the First LOI's title and terms make clear that it was designed to be non-binding.  (ECF No. 12 at 9.)   However, for the same reasons Cunningham Energy has plausibly alleged the existence of a valid and enforceable contract, it has also plausibly alleged justifiable reliance that Vesta would be bound by the promises made by Cott and the First LOI, and would fully perform its obligations.   Therefore, because the well-pleaded factual allegations of

14

Cunningham Energy's Verified Complaint give rise to a plausible claim for relief under a theory of promissory estoppel, the Court **DENIES** Vesta's Motion to Dismiss with respect to Count II of Cunningham Energy's Verified Complaint.

      *C.  Count III for Detrimental Reliance*

      The parties' arguments with respect to Cunningham Energy's Count II for Promissory Estoppel and its Count III for Detrimental Reliance are identical.  (ECF Nos. 12 at 8–10, 18 at 15.)  Nevertheless, detrimental reliance and promissory estoppel are duplicative causes of action because they allege the same elements entitling Cunningham Energy to relief.  To be sure, "detrimental reliance" and "promissory estoppel" are frequently used interchangeably to describe the same cause of action, and detrimental reliance is an element of a promissory estoppel claim. *See Koerber v. Wheeling Island Gaming, Inc.*, No.: 5:12CV97, 2013 WL 162669, at \*4 (N.D. W. Va. Jan. 15, 2013) (citing *Everett*, 321 S.E.2d 685)) ("Under West Virginia law, the claim of promissory estoppel/detrimental reliance requires proof . . . that the plaintiff suffered damages as a result of her reasonable reliance upon the promise of the defendant[.]").

      Therefore, because Counts II and III are duplicative of one another, they cannot both survive.  *See Raab v. Smith & Nephew, Inc.*, 150 F. Supp. 3d 671, 696 (S.D. W. Va. 2015) (dismissing a claim as duplicative of another claim for relief alleged by the plaintiff). Accordingly, the Court **GRANTS** Vesta's Motion to Dismiss with respect to Count III of Cunningham Energy's Verified Complaint.

      *D.  Count IV for Breach of Good Faith and Fair Dealing*

      Count IV for Breach of Implied Duty of Good Faith and Fair Dealing alleges that Vesta "withheld capital in order to induce Cunningham Energy to additionally assign Vesta [ ] its farmout

interest in Canada."   (ECF No. 1 at 11–12, ¶¶ 74–76.)   Vesta argues that Count IV should be dismissed because "a claim for breach of the common law duty of good faith is not recognized as an independent cause of action in West Virginia," and "[a]ny consideration of breach of such common law duty is contained within the independent evaluation of Cunningham Energy's claim for breach of the First LOI (Count I), which itself fails[.]"   (ECF No. 12 at 10.)   Cunningham Energy contends that the First LOI, the Second LOI, and the MOU "carry with them a duty of good faith and fair dealing in their performance" and that Vesta failed to negotiate in good faith. (ECF No. 18 at 15–16.)

In every contract there is an implied covenant of good faith and fair dealing.   *Gaddy Engineering Co. v. Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 568, 579 (W. Va. 2013) (affirming a trial court's grant of summary judgment on the petitioner's claims asserting a breach of the duty of good faith and fair dealing when summary judgment was properly granted as to the contract-based claims).   As Vesta notes, "this covenant 'does not provide a cause of action apart from a breach of contract claim.'"   *Id.* (quoting *Highmark West Virginia, Inc. v. Jamie*, 655 S.E.2d 509, 514 (W. Va. 2007)).

Nevertheless, when a breach of contract claim is adequately plead, a separate claim alleging a breach of the common law duty of good faith and fair dealing with respect to the purported contract may stand.   *See Covol Fuels No. 4, LLC v. Pinnacle Min. Co., LLC*, 785 F.3d 104, 114–15 (4th Cir. 2015) (holding that summary judgment should not have been granted as to the plaintiff's claim for breach of the implied covenant of good faith and fair dealing when the defendant was not entitled to summary judgment on the plaintiff's breach of contract claim).   The Court need not reiterate the reasons Cunningham Energy has plausibly alleged that the First LOI

is a binding and enforceable contract.   Because Cunningham Energy's claim for breach of the First LOI survives, its claim that Vesta failed to act in good faith and deal fairly also survives, so long as the Verified Complaint's well-pleaded factual allegations state a plausible claim for relief.

Here, the Verified Complaint alleges that Vesta "withheld capital in order to induce Cunningham Energy to additionally assign Vesta [ ] its farmout interest in Canada."   (ECF No. 1 at 12, ¶ 75.)   The Verified Complaint also alleges Vesta's subsequent performance of the terms of the First LOI and sudden refusal to provide funding as set forth in the First LOI.   (*Id.* at 6–7, ¶¶ 30–40.)   It further alleges Cunningham Energy's repeated demand to Vesta to fulfill its investment and funding obligations, as well as Vesta's ceasing of communication with Cunningham Energy.   (*Id.* at 7, ¶¶ 39–40.)   These factual allegations are sufficient to state a plausible claim for relief arising from Vesta's alleged breach of the common law duty of good faith and fair dealing.

Therefore, because the Verified Complaint adequately pleads the existence of an enforceable contract between Cunningham Energy and Vesta, and because the well-pleaded factual allegations give rise to a claim that Vesta breached its duty to act in good faith and to deal fairly, the Court **DENIES** Vesta's Motion to Dismiss with respect to Count IV of Cunningham Energy's Verified Complaint.

### E.  Count V for Fraud in the Inducement

Vesta argues that Count V of Cunningham Energy's Verified Complaint for Fraud in the Inducement should be dismissed for two reasons.   (ECF No. 12 at 11.)   First, Vesta argues that Cunningham Energy has not plead this claim with sufficient particularity to overcome Federal Rule of Civil Procedure 9(b)'s heightened pleading standard.   (*Id.* at 11–12.)   Second, Vesta

17

contends that Cunningham Energy cannot prove that it was induced into entering a contract because the First LOI is not a binding agreement.   (*Id.* at 12–13.)   However, this second argument need not be addressed by the Court because, as discussed above, Cunningham Energy has plausibly alleged for purposes of Vesta's Motion to Dismiss that the First LOI was a binding and enforceable agreement.

Rule 9(b) of the Federal Rules of Civil Procedure imposes a heightened pleading standard for claims grounded in fraud.   *See United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.2d 451, 455–56 (4th Cir. 2013).   To satisfy Rule 9(b), allegations of fraud "must state with particularity the circumstances constituting the fraud or mistake."   Fed. R. Civ. P. 9(b).   This heightened pleading standard requires the complaint to describe at a minimum, "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."   *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)) (internal quotations omitted).   Even so, "[a] court should hesitate to dismiss a complaint under Rule 9(b)" if the allegations of fraud are specific enough to give the defendant notice "of the particular circumstances for which [it] will have to prepare a defense at trial" and the "plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784.

To recover under a theory of fraudulent inducement, a plaintiff must prove the following elements:

> (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it.

18

*The Traders Bank v. Kollar*, Civ. Action No.: 6:07-cv-00178, 2008 WL 746693, at *3 (S.D. W.
Va. Mar. 18, 2008) (quoting *Horton v. Tyree*, 139 S.E. 737, 738 (W. Va. 1927)).

Vesta contends that Cunningham Energy has failed to allege the "what" or the "where" of
the alleged fraud.  (ECF No. 12 at 11.)   Specifically, Vesta argues that "except for negotiations
of the [First] LOI and, presumably, the [First] LOI itself, there is no fraudulent act or statement
attributed to Vesta . . . , nor are the contents of such fraud described."  (*Id.*)   Conversely,
Cunningham Energy maintains that the First LOI is a binding agreement, and that Vesta
fraudulently put itself in an advantageous position at the expense of Cunningham Energy by
promising to fund its operations and extinguish its Tier One Payables, with no intention of
following through on that promise, in exchange for an ownership interest in the School Property
and specifically identified assets in West Virginia.   (ECF No. 18 at 16–17.)

Based on the well-pleaded factual allegations in the Verified Complaint, Cunningham
Energy has alleged with sufficient particularity the circumstances constituting the alleged fraud on
the part of Vesta.   Cunningham Energy has alleged specific representations made by Vesta—in
the form of the First LOI, as well as representations made by Vesta CFO Rick Cott—that induced
Cunningham Energy to assign its interests in the Holdings Assets to Vesta, under the supposed
guise that Vesta would provide it with operational funding.  (ECF No. 1 at 4–5, ¶¶ 19–24.)   The
particular misrepresentation Cunningham Energy alleges Vesta made was that it would provide
Cunningham Energy with operational funding for various oil and gas operations, as well as funding
to extinguish nearly two million dollars of debt.   (*Id.* at 4, ¶ 23.)   The particular benefit obtained
by Vesta under this arrangement was that it would be assigned several of Cunningham Energy's
oil and gas assets and real estate.   (*Id.* at 4, ¶ 22.)   Finally, Cunningham Energy alleges that Vesta

made these materially false representations to obtain Cunningham Energy's oil and gas assets—which Vesta allegedly viewed as leverage to obtain further assets that were not contemplated by the terms of the First LOI.   (*Id.* at 12, ¶¶ 79–82.)

The well-pleaded factual allegations contained in the Verified Complaint state with sufficient particularity the circumstances constituting the alleged fraud, and they give Vesta sufficient notice of the particular circumstances for which it will have to prepare a defense at trial. Therefore, the Court **DENIES** Vesta's Motion to Dismiss with respect to Count V of Cunningham Energy's Verified Complaint.

### F.   *Count VI for Misrepresentation*

Vesta argues that Cunningham Energy's Count VI claim for Misrepresentation fails because it cannot prove justifiable reliance.   (ECF No. 12 at 8–10.)   Cunningham Energy merely repeats its arguments concerning its claim under Count V for Fraudulent Inducement to support its assertion that it has sufficiently plead a claim for misrepresentation.   (ECF No. 18 at 18.) However, Cunningham Energy's claims for misrepresentation and fraudulent inducement are duplicative causes of action and rely on the same factual allegations to support its claim for relief. To be sure, Cunningham Energy must prove a materially false misrepresentation by Vesta to succeed on its fraudulent inducement claim.   *See Soyoola v. Oceanus Ins. Co.*, 986 F. Supp. 2d 695, 708 (S.D. W. Va. 2013) (quoting *Horton*, 139 S.E. at 738) (explaining the elements that must be shown to recover for fraudulent misrepresentation).   Therefore, Count V for Fraudulent Inducement and Count VI for Misrepresentation cannot both survive.   *See Raab*, 150 F. Supp. 3d at 696 (dismissing a claim as duplicative of another claim for relief alleged by the plaintiff).

Accordingly, the Court **GRANTS** Vesta's Motion to Dismiss with respect to Count VI of Cunningham Energy's Verified Complaint.

### G. Counts VII and VIII for Violations of the West Virginia Uniform Securities Act and the Federal Securities Exchange Act of 1934

Vesta argues that Counts VII and VIII of Cunningham Energy's Verified Complaint should be dismissed because they do not allege the offer, purchase, or sale of a "security."   (ECF No. 12 at 13–14.)   Although Vesta cites the statutory definitions of "security" under the West Virginia Uniform Securities Act and the Federal Securities Exchange Act of 1934 (the "Federal Securities Exchange Act"), its argument that Cunningham Energy's equitable interest in Holdings does not fall within either of those definitions is conclusory and fails to explain why it does not constitute a "security."   Likewise, Cunningham Energy's contention that "Vesta's obligation under the First LOI to convey an interest in [Holdings] to hold the Holdings Assets constitutes a contemplated sale or offer to sell securities" is also conclusory.  (ECF No. 18 at 18.)   In fact, Cunningham Energy fails to so much as cite either statutory definition of "security" in its Response to support its argument that the contemplated equitable interest in Holdings constitutes a "security." Nevertheless, based upon the circumstances described in the well-pleaded factual allegations in the Verified Complaint, the proposed equitable interest in Holdings could plausibly be a "security" within the meaning of both the West Virginia Uniform Securities Act and the Federal Securities Exchange Act, thereby precluding dismissal of Counts VII and VIII for failure to state a claim.

#### 1. The West Virginia Uniform Securities Act

Under the West Virginia Uniform Securities Act, any person who "[o]ffers or sells a security by means of any untrue statement of a material fact . . . , and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known,

21

of the untruth . . . , is liable to the person buying the security from him, who may assert a claim in a civil action. . . ."   W. Va. Code § 32-4-410.   The West Virginia Uniform Securities Act defines "security" as "any . . . stock; certificate of interest or participation in any profit-sharing agreement; . . . investment contract; . . . certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a 'security[.]'"   W. Va. Code § 32-4-401(n).

The case law on the statutory definition of "security" under the West Virginia Uniform Securities Act is scant, to say the least.   In fact, there does not appear to be a single decision from the West Virginia Supreme Court of Appeals, the Fourth Circuit, the Southern District of West Virginia, or the Northern District of West Virginia that so much as cites the West Virginia Uniform Securities Act's definition of "security".

However, the West Virginia Uniform Securities Act follows the Uniform Securities Act of 1956, which was modeled after the Federal Securities Act of 1933.   *See* Comment to § 401(l) of the Uniform Securities Act of 1956 ("This subsection is identical with §2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(a)(1), except for oil, gas and mineral interests and the addition of the last sentence. . . .   Moreover, substantially that definition—particularly the phrase 'investment contract'—has been broadly construed by both state and federal courts.").   Further, the United States Supreme Court has said that the definition of "security" under the Federal Securities Act of 1933 is "virtually identical" to the Federal Securities Exchange Act of 1934's definition.   *See* *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847 n.12 (1975).   Accordingly, the Court will proceed with its analysis by interpreting the West Virginia Uniform Securities Act consistent with the scope of the Federal Securities Exchange Act.

22

2. <u>The Federal Securities Exchange Act</u>

Under section 10(b) of the Federal Securities Exchange Act of 1934 (the "Securities Exchange Act"), it is "unlawful for any person . . . [t]o use or employ in connection with the purchase or sale of any *security* . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe[.]"   15 U.S.C. § 78j(b) (emphasis added).   The Federal Securities Exchange Act defines "security" as including "any . . . certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, . . . investment contract, . . . or in general, any instrument commonly known as a 'security[.]'"   15 U.S.C. § 78c(a)(10).   This definition is "quite broad" and "includes both instruments whose names alone carry well-settled meaning, as well as instruments of 'more variable character [that] were necessarily designated by more descriptive terms,' such as 'investment contract' and 'instrument commonly known as a security.'"   *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 (1985).   Nevertheless, the statutory definition of "security" is not unlimited in scope.   *See Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982) ("[W]e are satisfied that Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud.").   "Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole."   *Id.* at 560 n.11.

Based upon the factual allegations in the Verified Complaint, Cunningham Energy has plausibly alleged a contemplated offer or sale of a "security" under the First LOI.   In its Response in Opposition to Vesta's Motion to Dismiss, Cunningham Energy argues that "Vesta's obligation under the First LOI to convey an interest in an LLC to be formed to hold the Holdings Assets

constitutes a contemplated sale or offer to sell securities."  (ECF No. 18 at 18.)   The Verified

Complaint alleges that "Vesta [ ] promised and/or offered to sell Cunningham Energy a security

interest in a newly created holdings company in the form of a Delaware LLC."  (ECF No. 1 at 13,

¶ 90.)   The purported "security interest" Cunningham Energy refers to is "a minority ownership

position" in a Delaware LLC that would be controlled and funded by Vesta Holdings.   (*Id.* at 4, ¶

20.)   In exchange for this "minority ownership position," Cunningham Energy agreed to transfer

specific "Holdings Assets" to the newly-formed LLC.   (*Id.* at 4, ¶ 20–23.)

The First LOI describes this "minority ownership position" as Cunningham Energy's

"Equity Interests."  (ECF No. 18-2 at 3.)   As explained above, this "Equity Interest" included

"twenty percent (20%) of the total Equity Interest in Holdings until Holdings [ ] distributed to

[Vesta] an amount equal to [Vesta's] Preferred Return," whereupon Cunningham Energy's

"Equity Interest" was to increase to "[f]ifty [p]ercent (50%) of the total Equity Interest in

Holdings." (*See* ECF No 18-2 at 3.)   The Verified Complaint also alleges that this "Equity

Interest" was offered to Cunningham Energy in exchange for the transfer of specific assets set

forth in the First LOI to Holdings, all while Vesta was to exclusively control and fund Holdings.

(ECF No. 1 at 4, ¶ 20.)

These factual allegations are sufficient to plausibly allege that the "Equity Interest" offered

to Cunningham Energy in Holdings constitutes a "security."   While greater factual development

may be necessary to make a determination on the merits as to whether Cunningham Energy's

proposed interest in Holdings constitutes a "security" under either the West Virginia Uniform

Securities Act or the Federal Securities Exchange Act, the well-pleaded factual allegations of the

Verified Complaint are sufficient at this stage of the proceedings to withstand Vesta's Motion to

Dismiss.   Therefore, because the well-pleaded factual allegations in Cunningham Energy's Verified Complaint give rise to a plausible claim for relief under both the West Virginia Uniform Securities Act and the Federal Securities Exchange Act, the Court **DENIES** Vesta's Motion to Dismiss with respect to Counts VII and VIII of Cunningham Energy's Verified Complaint.

### H.  Count IX for Joint Venture Liability

Vesta argues that Count IX of Cunningham Energy's Verified Complaint for Joint Venture Liability "is short and nothing 'more than . . . a formulaic recitation of the elements of [the] cause of action.'"   (ECF No. 12 at 14.)   Cunningham Energy contends that "the parties' performance of the transaction memorialized by the First LOI—particularly the drilling of the first well and related expenses—constitutes a joint venture between Vesta and Cunningham [Energy]," and "[t]hrough the joint venture, Vesta is liable to the vendors of Cunningham [Energy] related to the expenses of the first well."   (ECF No. 18 at 19.)

A joint venture "is an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge."   Syl. Pt. 5, *Armor v. Lantz*, 535 S.E.2d 737 (W. Va. 2000).   Under West Virginia law "joint venture" is not a stand-alone, independent basis for liability; it must relate to an underlying substantive cause of action.   *Farley v. Phillips and Jordan, Inc.*, No. 2:20-CV-00163, 2020 WL 1677407, at *3 (S.D. W. Va. Apr. 6, 2020) ("[J]oint venture may be alleged as a cause of action or claim in a complaint if it relates to a substantive cause of action, but it is not an independent basis for liability."); *Blizzard v. Infinity Home Mortgages, LLC*, No. 2:15-CV-13553, 2016 WL 5329614, at *4 (S.D. W. Va. Sept. 21, 2016) ("A joint venture and agency claim may be asserted independently but must be based on other underlying claims."); *W.W. McDonald Land*

*Co. v. EQT Prod. Co.*, 983 F. Supp. 2d 790, 811 (S.D. W. Va. 2013) ("Like civil conspiracy, joint venture is not a stand-alone claim, but a basis for vicarious liability.").

Here, Cunningham Energy fails to articulate in its Verified Complaint any underlying substantive causes of action for which the Vesta entities are liable under a theory of joint venture. Rather, the Verified Complaint summarily alleges that "[a]s a participant in the joint venture, Vesta Holdings and Vesta VFO are jointly liable for all debts and obligations pertaining to the venture." (ECF No. 1 at 16, ¶ 109.)   Nor does Cunningham Energy explain in its briefing on Vesta's Motion to Dismiss the underlying substantive causes of action to which its joint venture claim relates. Rather, Cunningham Energy only argues that the Court find the existence of a joint venture between Vesta and Cunningham Energy, and that through that joint venture, "Vesta is liable to the vendors of Cunningham [Energy] related to the expenses of the [drilling of the] first well."   (ECF No. 18 at 19.)

Because Cunningham Energy failed to relate its claim for joint venture liability to any particular underlying substantive cause of action, it has failed to state a plausible claim for relief under a theory of joint venture liability.   Therefore, the Court **GRANTS** Vesta's Motion to Dismiss with respect to Count IX of Cunningham Energy's Verified Complaint.

### I.   Count X for Piercing the Corporate Veil

Vesta argues that Cunningham Energy has woefully failed to plead entitlement to pierce any corporate veil for three reasons.   (ECF No. 12 at 16.)   First, Vesta contends that Count X of Cunningham Energy's Verified Complaint for Piercing the Corporate Veil "is threadbare and devoid of any 'factual enhancement.'"   (*Id.*)   Particularly, Vesta asserts that Count X does not allege any of the factors set forth by the West Virginia Supreme Court of Appeals in *Laya v. Erin*

*Homes, Inc.*, 352 S.E.2d 93 (W. Va. 1986) to assess whether it is appropriate to pierce the corporate veil under West Virginia law, much less buttress them with necessary factual allegations.   (*Id.*) Second, Vesta avers that "piercing the corporate veil is inappropriate in a contract case."   (*Id.* at 17.)   Finally, Vesta asserts that "[e]ven if Count X survives, it may only survive in part" because Defendant Coleman may only be personally liable on a contract breached by the corporation that entered the contract allegedly breached.   (*Id.* at 18.)

Cunningham Energy argues that dismissal of Count X at this stage of the proceedings would be inappropriate "because 'the propriety of piercing the corporate veil usually involves numerous questions of fact for the trier of the facts to determine upon all of the evidence.'"   (ECF No. 18 at 19) (citing Syl. Pt. 6, *Laya*, 352 S.E.2d 93).   In this respect, Cunningham Energy contends that "for the Court to sufficiently utilize the *Laya* framework, the parties would first need to develop a factual record in this case."   (*Id.* at 20 n.8.)

While Count X of the Verified Complaint for Piercing the Corporate Veil may require greater factual development for Cunningham Energy to ultimately succeed on the merits, such circumstances do not relieve Cunningham Energy of the requirement under the Federal Rules that it plead sufficient factual allegations showing a plausible entitlement to relief.   *See Twombly*, 550 U.S. at 555, 570 (holding that a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [the] claims across the line from conceivable to plausible").

Notwithstanding the need for greater factual development through discovery, Cunningham Energy must allege sufficient factual allegations showing an entitlement to pierce Vesta's corporate veil.   Under West Virginia law, piercing the corporate veil is an extraordinary remedy

that is only available "[u]nder exceptional circumstances." *Laya*, 352 S.E.2d at 98. "[T]he propriety [of piercing the corporate veil] must be examined on an *ad hoc* basis." *Id.* (internal citation omitted). Plaintiffs may "pierce the corporate veil" to hold shareholders personally liable if (1) there is a "unity of interest and ownership that the separate personalities of the corporation and of the individual shareholder(s) no longer exist (a disregard of formalities requirement) and (2) an inequitable result would occur if the acts are treated as those of the corporation alone (a fairness requirement)." *Dallas Nat'l Ins. Co. v. Owner's Sol., Inc.*, No.: 2:13-CV-10780, 2014 WL 12744644, at *3 (S.D. W. Va. Mar. 10, 2014) (citing Syl. Pt. 3, *Laya*, 352 S.E.2d 93). In *Laya*, the Supreme Court of Appeals of West Virginia established 19 factors that are relevant in determining whether to pierce the corporate veil. *Id.* (citing *Laya*, 352 S.E.2d at 98–99.)

Cunningham Energy's Verified Complaint does allege that "a unity of interest and ownership between Vesta [ ] and [Defendant] Coleman" exists "such that the separate personalities of the two no longer exist." (ECF No. 1 at 16, ¶¶ 111–12.) The Verified Complaint also alleges that "fraud, injustice, and inequity would result if not for piercing the veil." (*Id.* at 16, ¶ 113.) However, aside from these threadbare allegations, which are not entitled to the assumption of truth insofar as they are mere recitations of the elements that must be shown to pierce the corporate veil, *see King*, 825 F.3d at 214 (quoting *Iqbal*, 556 U.S. at 679), Count X is devoid of any factual allegations showing the existence of "a unity of interest and ownership" or of the inequitable circumstances that may only be avoided by piercing the corporate veil. Nor does the Verified Complaint allege any of the aforementioned relevant factors established in *Laya* to show that piercing Vesta's corporate veil in this case is appropriate.

28

As noted above, well-pleaded factual allegations are required; labels, conclusions, and a "formulaic recitation of the elements of a cause of action" is insufficient. *Twombly*, 550 U.S. at 555; *see also King*, 825 F.3d at 214 ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim."). Because Count X of the Verified Complaint fails to plead sufficient factual allegations showing a plausible entitlement to pierce Vesta's corporate veil, the Court **GRANTS** Vesta's Motion to Dismiss with respect to Count X for Piercing the Corporate Veil.

  *J. Counts XI and XIV Injunctive Relief*

   Vesta argues that Counts XI and XIV of Cunningham Energy's Verified Complaint should be dismissed because requests for injunctive relief do not constitute independent causes of action. (ECF No. 12 at 18.) Cunningham Energy contends that its Verified Complaint sufficiently alleges its claim for injunctive relief so that Vesta's Motion to dismiss should be denied. (ECF No. 18 at 20.) Requests for injunctive relief do not constitute independent causes of action; rather, the injunction is merely the remedy sought for the legal wrongs alleged in the substantive counts. *Pinnacle Min. Co., LLC v. Bluestone Coal Corp.*, 624 F. Supp. 2d 530, 539–40 (S.D. W. Va. 2009); *see also Warren v. Rodriguez-Hernandez*, No. 5:10CV25, 2010 WL 3668063, at *3 (N.D. W. Va. Sept. 15, 2010) (dismissing a plaintiff's cause of action for injunctive relief because "[t]he request for injunctive relief can only stand as a remedy for a cause of action").

   Because Counts XI and XIV of Cunningham Energy's Verified Complaint attempt to allege causes of action for injunctive relief, these Counts must be dismissed in light of the principle that requests for injunctive relief are not stand-alone causes of action. Therefore, the Court

**GRANTS** Vesta's Motion to Dismiss with respect to Counts XI and XIV of Cunningham Energy's Verified Complaint.

### K.  *Count XII for Breach of Contract for the Second LOI and Count XIII for Fraud in the Inducement of the Second LOI*

Vesta argues that Cunningham Energy's Count XII for Breach of Contract for the Second LOI and Count XIII for Fraud in the Inducement of the Second LOI should be dismissed because the Second LOI is void, and otherwise unenforceable.  (ECF No. 12 at 5.)  Vesta advances two arguments in support of its position.   The Court addresses each argument in turn.

First, Vesta argues the Second LOI is unenforceable because, like the First LOI, it "is explicitly non-binding by its own terms."  (*Id.*)   Cunningham Energy contends that, contrary to Vesta's assertion that the Second LOI is non-binding, "[n]ot all provisions in the Second LOI [were] non-binding," and "the provision that Cunningham [Energy] alleges was breached and seeks to enforce only operate[d] if the proposed transaction [was] not closed."  (ECF No. 18 at 13.)

As noted above, the preliminary character of a letter of intent is generally indicative of a nonbinding expression in contemplation of a future contract, that is, *unless circumstances suggest otherwise.  See Burbach Broad. Co. of Del.*, 278 F.3d at 406.   Like the First LOI, the Second LOI states that it "is not intended to be [ ] binding, but is instead intended only to serve as basis for negotiation of mutually acceptable agreements to be entered into with respect to the Proposed Transactions."  (ECF No. 18-7 at 1.)   However, similar to the First LOI, this statement in the Second LOI is expressly conditioned on the immediately preceding phrase—"*[e]xcept as specifically provided herein.*"  (*Id.*) (emphasis added).   Just as was the case with respect to the

30

First LOI, this phrase implies that while some aspects of the Second LOI may be nonbinding, other aspects were intended by the parties to be binding.

Cunningham Energy argues that "the provision [it] alleges was breached and seeks to enforce" pertains to Vesta's obligation to return the Holdings Assets in the event the Proposed Transaction under the Second LOI failed to close.  (ECF No. 18 at 13.)  Cunningham Energy contends that Vesta was required to assign it the Holdings Assets after the Proposed Transactions failed to close by November 15, 2019, and when it failed to do so, Vesta breached the Second LOI. (*Id.* at 14.)   This reading of the Second LOI is plausible, given the well-pleaded factual allegations described above.   Moreover, given the Second LOI's explicit inference that some provisions were intended to be binding on the parties, it is plausible that the Holdings Assets provision is binding to the extent it required immediate assignment of the Holdings Assets to Cunningham Energy when the Proposed Transaction failed to close by November 15, 2019.   Therefore, at this stage of the proceedings, this Court finds that the Second LOI could plausibly constitute a binding agreement in some respects—notwithstanding the non-binding characteristics of other provisions contained therein—thereby precluding dismissal of Counts XII and XIII on grounds that the Second LOI is wholly non-binding.

Next, Vesta argues that the Second LOI is unenforceable because it "is nonsensical as it seeks transfer of all of Vesta's interest in the School Property prior to conclusion of condemnation proceedings."  (ECF No. 12 at 5.)   Vesta contends the Second LOI is void because "it (1) fundamentally frustrates the purpose of the MOU, (2) is illusory and devoid of consideration, and (3) is patently ambiguous."  (ECF No. 12 at 6.)   Conversely, Cunningham Energy asserts that "[t]he Second LOI and the MOU can be easily reconciled without voiding the Second LOI—

namely, the MOU does not address who has title to the School Property," and "[t]he MOU, if valid, only deals with how the proceeds of any sale of the School Property are to be divided between Cunningham [Energy] and Vesta."   (ECF No. 18 at 13.)

       1.   <u>Frustration of Purpose</u>

In support of its argument that the Second LOI frustrates the purpose of the MOU, Vesta cites *State ex rel. State v. Sims*, No. 18-0672, 2019 WL 1976033, at *7 (W. Va. May 3, 2019) (Workman, J., concurring in part) (unpublished) (citing *State v. Boley*, 113 P.3d 248, 257 (Kan. 2005)).   This Court need not explain why an unpublished, concurring opinion that cites an opinion from another state's highest court is non-binding both in West Virginia and in this Court. Nevertheless, under West Virginia law, the doctrine of frustration of purpose discharges one party's duty to render performance under a contract "where, after [the] contract is made, [that] party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made[.]"   *Waddy v. Riggleman*, 606 S.E.2d 222, 229 n.9 (W. Va. 2004) (quoting Restatement (Second) of Contracts § 265 (1979)).

Vesta argues that the purpose of the MOU was to settle the First Lawsuit regarding the First LOI and to outline a path forward by which Cunningham Energy and Vesta would "work together to (a) reinforce the valuation of the School Property, (b) negotiate the sale of the School Property and/or litigate the value of the property, and (c) establish terms for the distribution of proceeds from such sale."   (ECF No. 12 at 6.)   Vesta also contends that Cunningham Energy's attempt to "hoodwink" Vesta by "inserting terms that accelerated the formation of the [Second] LOI and demanded immediate return of the School Property" contradicted the fundamental

purpose of the MOU and served to benefit Cunningham Energy to Vesta's detriment.   (*Id.* at 6–7.)

However, based upon the well-pleaded factual allegations of the Verified Complaint, it appears that the Second LOI and the MOU can be reconciled without frustrating the purpose of the MOU.   As Cunningham Energy notes, the MOU primarily relates to the condemnation proceedings regarding the School Property and the distribution of the proceeds from the sale of the School Property, if any.   (*See* ECF No. 18-8.)   Conversely, while the Second LOI does mention the School Property and the distribution of funds derived from the sale or condemnation of it, a fair reading of the Second LOI does not appear to impact the proposed distribution of the proceeds contemplated by the MOU.   Rather, the Second LOI appears to primarily govern the parties' future dealings as they relate to Holdings and Vesta's obligation to fund Holdings' operational costs.   (ECF No. 18-7 at 2–3.)   Therefore, while there may be some overlap concerning the School Property with respect to the Second LOI and the MOU, the Second LOI does not appear to frustrate the MOU's purpose.

### 2.   Lack of Consideration

Vesta also contends that the Second LOI lacks consideration insofar as it consists of only illusory promises.   (ECF No. 12 at 6.)   It is fundamental that a contract must be supported by consideration to be binding and enforceable.   *See* Syl. Pt. 1, *First Nat'l Bank of Gallipolis v. Marietta Mfg. Co.*, 153 S.E.2d 172 (W. Va. 1967).   The Fourth Circuit has addressed illusory promises, which have been held to be deficient forms of consideration:

> A promise becomes consideration for another promise only when it constitutes a binding obligation.   Unlike a binding obligation, an "illusory promise" appears to be a promise, but it does not actually bind or obligate the promisor to anything.

> Because an illusory promise is not binding on the promisor, an illusory promise cannot constitute consideration.

*Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005) (internal citations omitted).

Vesta appears to argue that the Second LOI lacks consideration because none of the promises contained therein bind it or Cunningham Energy to perform any obligation.   However, at this stage of the proceedings, Cunningham Energy has plausibly alleged that Vesta was obligated to return the Holdings Assets to Cunningham Energy in the event the Proposed Transaction failed to close by November 15, 2019.   (ECF No. 1 at 8, ¶¶ 46–47); (ECF No. 18-7) ("In the event the parties do not consummate the Proposed Transaction by the Closing Date, the Holdings Assets shall be immediately assigned back to Cunningham Energy. . . .").   While greater factual development may reveal the parties' intent with respect to the Second LOI, Cunningham Energy has sufficiently alleged that the Second LOI constituted a binding agreement and that Vesta breached when it failed to re-assign the Holdings Assets to Cunningham Energy after the Proposed Transaction failed to close by November 15, 2019.   These well-pleaded factual allegations are sufficient to withstand Vesta's Motion to Dismiss.

Therefore, because the well-pleaded factual allegations on the face of Plaintiffs' Verified Complaint give rise to a plausible claim for breach of contract of the Second LOI, the Court **DENIES** Vesta's Motion to Dismiss with respect to Count XII of Cunningham Energy's Verified Complaint.   Moreover, because the well-pleaded factual allegations of the Verified Complaint allege with sufficient particularity the grounds for relief under a theory of fraudulent inducement, the Court **DENIES** Vesta's Motion to Dismiss with respect to Count XIII of Cunningham Energy's Verified Complaint.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** Vesta's Motion to Dismiss, (ECF No. 11), insofar as it seeks dismissal of Counts III, VI, IX, X, XI, and XIV of Cunningham Energy's Verified Complaint and **DENIES IN PART** Vesta's Motion insofar as it seeks dismissal of Counts I, II, IV, V, VII, VIII, XII, and XIII of the Verified Complaint.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        January 5, 2022

THOMAS E. JOHNSTON, CHIEF JUDGE